

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

IRMA J. JOHNSON                    Civil Action No. 01-2714M
VERSUS                             Judge James Robert H. Shemwell
SEARS, ROEBUCK AND COMPANY         Magistrate Judge Kirk

## MOTION FOR SUMMARY JUDGMENT

On motion of IRMA J. JOHNSON, Plaintiff, appearing through undersigned counsel, and

on suggesting to the Court that as will appear from the pleadings, exhibits, and affidavit attached

to this motion, that there exists no genuine issue of material fact and therefore judgment should be

entered in her favor as a matter of law against Defendant Sears, Roebuck and Company.

DIANNE HILL (14992)
ATTORNEY AT LAW
130 DeSIARD STE 501
MONROE, LA 71201
(318) 325-6398

## CERTIFICATE OF SERVICE

I certify that a copy of the Motion for Summary Judgment, Statement of Undisputed

Facts, and Memorandum in support, with attachments has been served by U.S. mail to all counsel

of record.       This 13 day of September, 2002 , at Monroe, Louisiana.

Dianne Hill

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

SEP 1 3 2002

ROBERT H. SHEMWELL, CLERK
BY _____
                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

IRMA J. JOHNSON                         Civil Action No. 01-2714M
VERSUS                                  Judge James
SEARS, ROEBUCK AND COMPANY              Magistrate Judge Kirk

MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

## I.  STATEMENT OF FACTS

This is a suit to recover damages against an employer, Sears, Roebuck and Company, for discrimination against Plaintiff, Irma Jean Johnson, because of her religion.

Irma Johnson was hired by Sears, Roebuck and Company in August, 2000.  She was interviewed by Becky Hollis, the director of human resources. At the interview, Hollis reviewed Johnson's application for employment and asked Johnson why she was not available to work Friday nights and Saturdays. Johnson told Hollis that it was because of her religion, which is Holiness. Hollis indicated that she could work around that restriction. Irma Johnson was immediately hired for a position in the stockroom at a salary of $7.00 per hour.

Hollis then called in Sufrenia Montgomery and introduced her to Johnson as the new hire. Montgomery took Johnson on a tour of the area where she would be working. No dress requirements were discussed.

Before starting the job, Johnson attended an orientation session that was held for all new employees. The leader passed out an Associate Handbook to everyone present, and asked each person to tear out and sign a page acknowledging receipt of the handbook. The dress code for stock room employees was not discussed at the meeting.

As Johnson left the meeting, she had a brief conversation with Montgomery and asked her whether it was all right that she did not wear pants. Montgomery stated that she would

discuss it with Hollis and let Johnson know. Johnson was later told that Sears had no position for her and could not use her services. Johnson discussed the problem with Don Holley, who is the General Manager for the store.  Holley offered Johnson a part time job cleaning commodes that was available for the weekends. Johnson asked Holley if he expected any other openings and was told that perhaps a position in customer service would become available in September or October. Johnson asked to be contacted when there was another opening, but never heard from Holley after that date.

Irma Johnson filed a complaint for discrimination with the Equal Employment Opportunity Commission against Sears, Roebuck and Company August 23, 2000. On October 31, 2001, the Equal Employment Opportunity Commission issued Johnson a Right to Sue Letter, and this suit followed.

## II.  JOHNSON WAS FIRED FOR HER RELIGIOUS PRACTICES

Rule 56 of the Federal Rules of Civil Procedure allows any party to move for summary judgment in his favor upon any or all of his claims. Summary Judgment is granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See, *Freeman v. Continental Gin Co.*, 381 F.2d 459 (5th Cir. 1967). The record shows there are no issues of material fact in this matter.

An employer is prohibited from discriminating in the terms and conditions of its employment. *42USC§2000e*.  To state a *prima facie* case of discrimination based on religion, Irma Johnson must prove that: 1)She holds a sincere religious belief; 2) Her beliefs conflict with a requirement of her employer; 3) The employer was informed of the conflict; and 4) She was discharged for failure to comply with the conflicting requirement. *See, Turpen v. Missouri K.T.R. Co.*, 736 F.2d 1022 (5th Cir. 1984). This has been demonstrated by the events surrounding her

hiring and termination as recited above. *Ex. A, C.*

In answer to the suit, Sears avers that Johnson was terminated due to her refusal to adhere to Sears' dress/safety codes. Thud, Johnson has satisfied the requirements for a *prima facie* case.

Nonetheless, evidence indicates that the dress code defense lacks verity. Sears refers to its published dress code as proof of its requirement that employees who work in the stock room wear pants. *See Associate Handbook excerpt, Ex. B.* The handbook does not mandate the wearing of pants. The dress code provides "suggested dress combinations". Although pants are apparently preferred, they are not mandatory. The dress code never states that the attire is compulsory. The dress code does contain a more exacting safety note for Merchandise Support personnel: "Associates responsible for lifting/moving heavy merchandise must wear back support belts and safety shoes." *Ex. B.* This is the sole requirement designated. Sears has never alleged that Irma Johnson was required to wear a back support and safety shoes, or that she refused to do so.

In answer to discovery propounded by Plaintiff, Sears declares that its dress requirements were made in compliance with OSHA regulations. Despite repeated demands made by Plaintiff, Sears has never designated the OSHA regulations it relied upon to require the wearing of pants. The lack of evidence further indicates that the dress code defense is false and is a pretext for discrimination by Sears.

III.    NO REASONABLE JOB ACCOMMODATION WAS OFFERED TO PLAINTIFF

Once an employee states her need for a religious accommodation, it is the employer's duty to seek a reasonable accommodation. *Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141 (5th Cir. 1982). Sears must show that it reasonably accommodated Johnson's religious practices or that it is unable to do so without undue hardship to conduct of its business. *Ansonia B. of Educ. V. Philbrook,* 479 U.S. 60 (1986); *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977).

Sears has failed to offer Irma Johnson any reasonable accommodation. The general manager, Don Holley, offered her a part time job that required work on weekends, saying that this was the only position available that did not require Johnson to wear pants. However, Johnson had indicated in her application for employment that she was not available for weekend work. This was specifically discussed at the interview when she was hired.[1] *Ex. A, C pp.84, 85.* The job offer was made on or near August 18, 2000. To date, Sears has not offered another position to Irma Johnson.

Sears has not met its obligation to accommodate the religious restrictions of Irma Johnson. The blanket requirement that women who work in the stock room not wear pants affects all persons of the Holiness religion, and excludes them from that job.

## IV.  DAMAGES

A civil rights litigant may recover general damages for pain, suffering, humiliation, and reasonable attorney fees. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 182 n.4 (1989). Irma Johnson was hired at a salary of $7.00 an hour. She seeks damages for lost wages and benefits that she would have earned had she not been terminated by Sears, Roebuck and Company.

Johnson seeks punitive damages for flagrant disregard of her rights. Punitive damages are awarded to punish the defendant and to serve as an example or warning to others not to engage in such conduct. In a discrimination case, punitive damages are awarded to Plaintiff if the Defendant acted with malice, or for the purpose of causing injury to Plaintiff, or with reckless indifference to Plaintiff's right to be free from discrimination based on religious belief. The court

---

[1] Plaintiff requested through discovery the entire personnel  file of Irma Johnson, but never received her employment application.

considers 1) How offensive the Defendant's conduct was; 2) How Defendant's conduct impacted Plaintiff; 3) The amount needed, considering Defendant's financial condition, to prevent further repetition of Defendant's conduct; and 4) The relationship to the amount of actual damages awarded. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19 (1991); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 156 F.3d 581 (5th Cir. 1998).

Sears' managers were well aware of Johnson's religious restrictions, and knew that she could not wear pants, and that she could not work weekends. Yet the only job they offered her was one for weekend work. The refusal of any reasonable accommodation for Johnson is in flagrant disregard of her federally protected rights.

Summary Judgment is appropriate only for items of damages that are not in dispute. *Bamberger Broadcasting Service Inc. v. Williams Irving Hamilton Inc.,* 33 F. Supp. 273 (1940). Johnson seeks a hearing to determine the amount of damages to be awarded.

V.    CONCLUSION

Plaintiff, Irma Johnson, prays for summary judgment finding that Defendant, Sears, Roebuck and Company, discriminated against her because of her religion by refusing to provide her a job that did not require that she wear pants or work weekends. Sears is liable for all monetary loss and emotional suffering Johnson has sustained by reason of the violations including attorney fees and all costs of this action.

Plaintiff further prays that Sears, Roebuck and Company be ordered by mandatory injunction to enjoin from engaging in the above unlawful employment practices and take such affirmative actions as are necessary to assure that the effects of said violations are eliminated.

Plaintiff further prays that Sears, Roebuck and Company be ordered to reinstate Plaintiff with back pay and compensatory, punitive, and liquidated damages for the losses she sustained by

reason of the violations of the acts by agents of Defendant with interest from date of judicial

demand; and to order all general and equitable relief as the Court deems necessary or proper.

_DIANNE HILL (14992)_
ATTORNEY AT LAW
130 DeSIARD STE 501
MONROE, LA 71201
325-6398

Ex
A

# AFFIDAVIT

STATE OF LOUISIANA
PARISH OF OUACHITA

BEFORE ME, the undersigned Notary Public, personally came and appeared:

IRMA JEAN JOHNSON

who, after being duly sworn, did depose and state that:

She is the Petitioner in the above matter and she applied for a job with Sears and Roebuck in Monroe, Louisiana in August, 2000. I was interviewed by Becky Hollis at Sears. I had stated on my job application that I was not available to work on Friday nights and Saturdays. When Ms. Hollis asked why I was unavailable those days and I told her it was because of my religion, which is Holiness. She said she could work around it.

She offered me a job in stocking that paid $7.00 an hour. Then I was introduced to Sufrenia Montgomery who would be my new supervisor. Ms. Montgomery took me on a tour and showed me where I would be working. She said I would be unloading clothes racks from trucks when new merchandise came in. She never said I had to climb ladders or use knives to open cartons.

I attended orientation for all new employees a few days later. During orientation, there was no discussion of dress requirements. Handbooks were passed out and we were told to tear a page out and sign it and add our unit number. The books were not discussed. There was no mention that I was required to wear pants or steel–toed shoes. I talked with Ms. Montgomery after the meeting and asked her if it was okay for me not to wear pants. She said she would check with Ms. Hollis. After I did not hear from Ms. Montgomery I called Ms. Hollis and was told that she would get back to me. Two days later I called back and was told that Sears could not use my services because I could not wear pants.

About a week later, Don Holley offered me a part–time job for Friday, Saturday and Sunday cleaning out commodes. I did not accept it. My application already stated that I could not work Friday nights or Saturdays. Mr. Holley said he would have something else available in September or October. I asked him to give me a call when he had something else available. I never from him.

_____
IRMA J. JOHNSON

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___11th___ DAY OF SEPTEMBER, 2002 AT MONROE, LOUISIANA.

_____
NOTARY PUBLIC

Ex
B

# Dress Code

As an Associate of Sears, you are expected to dress in appropriate business attire and adhere to commonly accepted standards of grooming which represent a professional and business like image. Provided below are suggested dress combinations for the department you are working in. (Local policy may vary.)



**Associate Handbook**

## Apparel/Home Fashions

### Women
- Dress
- Suit
- Skirt/Split Skirt, Blouse or Sweater
- Pantsuit
- Dress Slacks, Blouse, Coordinating Blazer
- Pumps, Dress Flats, Dress boots

### Men
- Suit
- Dress Slacks, Dress Shirt, Tie
- Dress Slacks, Dress Shirt, Tie, Sportcoat
- Dress Shoes, Slip–Ons

## Home Improvement

### Women
- Dress
- Skirt/Split Skirt, Blouse or Craftsman Polo Shirt
- Dress Slacks, Blouse or Craftsman Polo Shirt
- Pumps, Dress Flats

### Men
- Dress Slacks, Dress Shirt, Tie
- Dress Slacks, Craftsman Polo
- Dress Shoes, Slip–Ons

**Note:** Craftsman apron, smock vest or polo shirt must be part of any ensemble.

## Brand Central

### Women
- Dress
- Suit
- Pantsuit
- Pumps, Dress Flats

### Men
- Suit
- Dress Slacks, Dress Shirt, Tie, Sportcoat
- Dress Shoes, Slip-Ons

Note:  Jackets must be worn at all times.

## HUB

### Women
- Dress
- Suit
- Skirt/Split Skirt, Blouse or Sweater
- Pantsuit
- Dress Slacks, Blouse, Coordinating Blazer
- Pumps, Dress Flats, Dress boots

### Men
- Suit
- Dress Slacks, Dress Shirt, Tie
- Dress Slacks, Dress Shirt, Tie, Sportcoat
- Dress Shoes, Slip-Ons

## PEP

### Women
- Pants, Shirt, or Store T-Shirt
- Jeans, Shirt or Store T-Shirt
- Non-slip Casual Shoes

### Men
- Pants, Shirt, or Store T-Shirt
- Jeans, Shirt or Store T-Shirt
- Non-slip Casual Shoes

Safety Note:  Associates responsible for lifting/moving heavy merchandise must wear back support belts and safety shoes.

## Merchandise Support

### Women
- Pants, Shirt, or Store T-Shirt
- Jeans, Shirt or Store T-Shirt
- Non-slip Casual Shoes

### Men
- Pants, Shirt, or Store T-Shirt
- Jeans, Shirt or Store T-Shirt
- Non-slip Casual Shoes

Safety Note:  Associates responsible for lifting/moving heavy merchandise must wear back support belts and safety shoes.



# ORIGINAL

1

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DIVISION OF LOUISIANA

 3

 4

 5

 6   IRMA J. JOHNSON

 7   V.S.                              NO. CV-01-2714M

 8   SEARS, ROEBUCK AND COMPANY

 9

10

11

12

13                   DEPOSITION OF

14                   IRMA JOHNSON

15   was taken commencing at 10:02 a.m. April 23, 2002 at the

16   law offices of Dianne Hill, 130 DeSiard Street, Monroe,

17   Louisiana on behalf of the Defendant.

18

19

20

21

22

23              REPORTED BY:

24                   Lillian Dozier
                     Certified Court Reporter
25                   Certificate Number 92213
                     State of Louisiana
```

**EXHIBIT**

1

**DURHAM COURT REPORTING, INC.**
P.O. Box 7166
Monroe, LA 71211
(318) 388-4886

1  correct?

2  A    Correct.

3  Q    Who was it at Sears?

4  A    Ms. Holley - Holley.

5  Q    Don Holley?

6  A    Uh-uh (indicating no).

7  Q    It was a woman?

8         **MR. HOLLEY:**

9              Becky Hollis.  Hollis, I think, is what

10  she's wanting to say.

11        **MS. GLUTH:**

12             Okay.

13        **THE WITNESS:**

14             What?  What's that name?

15  Q    I'll ask you.  That's okay.  Do you recall her name

16  being Becky Hollis?  It was a woman?

17  A    Correct.

18  Q    Okay.  And she was the HR director at Sears,

19  correct?

20  A    Yes.

21  Q    Okay.  And I'm going to show you an appointment

22  reminder it looks like.  It says mock interview

23  appointment for Irma Jean Johnson; interview time, 1:00

24  o'clock; employer, Sears; business name, WTOC; location,

25  Dunlop.

79

1 your resume, correct, and your experience?

2 A    Did I?

3 Q    Yes.

4 A    Did I go over my resume?

5 Q    Sure.  Did she talk - did you discuss it?  Did you

6 discuss your experience?

7 A    Yes.

8 Q    Okay.  And she offered you a job?

9 A    Yes.

10 Q    And she offered you the job in the replenishment

11 crew, correct?

12 A    She said stocking.

13 Q    Okay.  And you were told that you would stock soft

14 line goods such as apparel and - were you told that or

15 not?

16 A    Apparel?

17 Q    What were you told that you would be stocking?

18 A    I was told from Frenia that I would be working with

19 the babies - stocking the baby stuff and clothing and

20 pulling wrapped clothes off the truck.

21 Q    Okay.  During your interview with Becky Hollis

22 there was another woman there, correct, Sufrenia

23 Montgomery?

24 A    Correct.

25 Q    And that's who you are calling Frenia?

84

1  Q    Okay.

2  A    - over in West Monroe.

3  Q    Okay.  So during your interview with Becky Hollis

4  and with Ms. Montgomery you went over your experience

5  based on this resume, correct?

6  A    Correct.

7  Q    And they offered you the job -

8  A    Correct.

9  Q    - in stocking?  And you told them at that point

10 that you couldn't work Friday nights and Saturdays

11 because of your religion, correct?

12 A    Correct.

13 Q    Okay.  And they said that's fine, we'll work around

14 that schedule?

15 A    Ms. Hollis did.

16 Q    In other words, she said that she would accommodate

17 your work schedule because of your religion?

18 A    That's what she said.  She didn't say them in those

19 exact words.  She just told me that we could work around

20 that.

21 Q    At that point did you tell her what your religion

22 was?

23 A    Holiness.

24 Q    I know, but did you tell her that your religion was

25 Holiness and that you could not work on Friday nights

1    and Saturdays because of your religion?

2    A    Yeah.

3    Q    Okay.

4    A    She asked.

5    Q    Okay.

6    A    She didn't ask because of my religion.  She didn't

7    ask - she asked me the nights and days that I could

8    work.

9    Q    Okay.  All right.  Then I understand you show up

10   for a training, for your training, correct?

11   A    I showed up for -

12   Q    Orientation?

13   A    - orientation.

14   Q    And that was a couple of days after you had your

15   interview with Becky and Ms. Montgomery?

16   A    A day after.

17   Q    The day after?  According to my records I have a

18   woman by the name of Patti Frith leading the orientation

19   that day.  Is that what you recall?

20   A    Uh-huh (indicating yes).

21   Q    Yes?

22   A    Correct.

23   Q    And that Becky Hollis also attended at least some

24   of the orientation; is that correct?

25   A    Correct.

1 back and ask her - to tell her about me, that I don't

2 wear pants.  That's how that was.

3 Q    Okay.  So you told -

4 A    And I asked her would it be all right if I would -

5 if could wear shorts under my skirt, blue jean skirt.

6 That's how that was.

7 Q    All right.  You were leaving and you came back to

8 ask Ms. Montgomery if it would be okay - did you - you

9 told Ms. Montgomery at that point that you don't wear

10 pants?

11 A    Pardon me?

12 Q    You told Ms. Montgomery at that time that you

13 didn't wear pants?

14 A    What time?

15 Q    I'm sorry.  You were leaving after your

16 orientation.  You had a conversation with Ms.

17 Montgomery, then you were leaving the store.  You said

18 you turned around -

19 A    Yes -

20 Q    - and you came back to tell her that you don't wear

21 pants and you'd like to wear shorts underneath your

22 skirt?

23 A    Let's do it professionally.  When she dismissed us

24 out of the orientation she asked me to go with Ms.

25 Frenia -

91

1   Q      Okay.

2   A      - my supervisor and she would - from there on my

3   supervisor would tell me what I had to do.

4   Q      All right.

5   A      We walked out of the orientation into the hall and

6   she told me, ready for work.  I say, yeah.  She say,

7   well, I'll see you at 6:00 o'clock in the morning.  And

8   I say, I'm excited.  And I say, okay, then, I say, see

9   you in the morning.  I looked back.  She had started

10  talking to a lady.  I don't know who the lady was but,

11  anyway, as I got to the door I thought about my - me.  I

12  went back to her.  I say, Ms. Frenia.  She say, yeah,

13  uh-huh.  I say, I don't wear pants.  I say, would it be

14  all right if I wear shorts under my skirt.  And she

15  looked at me.  She say - she paused for a minute and I

16  saw that look on her face.  I say, would it be all

17  right.  She say, let me get back with you on that.

18  That's what she said.

19  Q      Okay.  Are you finished?

20  A      And after she said let me get back with you on that

21  I felt like something was going to happen negative.  I

22  just felt it in my spirit.  And I say, what, like that.

23  I said, what, anything wrong.  And she say, I'll call

24  you; I'll call you.  She said it twice.  I said, oh,

25  God.  And I walked out the door and when I looked around

1  she was right behind me just I'm going to call you;

2  ain't nothing to worry about.  I say, well, I'll be

3  looking for you to call me now.

4      And after I got home this deep fear came over me,

5  and I called Ms. Becky.  Ms. Becky - I called Ms. Becky

6  and Ms. Becky - I asked to speak to Ms. Becky and it

7  took a while for her to get to the phone.  Then when she

8  got to the phone I say Ms. Becky, I said, do I still

9  have my job and she say, yes, Irma.  She say, I just got

10  to find somewhere to put you.  And I say, what you mean

11  find somewhere to put me.  She say, Irma, I'll call you

12  back.  But she didn't call me back that day.

13      I was - I was up all night wondering did I have a

14  job.  And my grandbaby I didn't - I didn't even let him

15  know nothing.  And the next day she didn't call me.  I

16  called her.  But she didn't come - she - they say she

17  wasn't at the - at the job so it was another day.

18      The third day I called her.  It's - I got on the

19  phone early that morning.  She answered the phone.  I

20  said, Ms. Becky, I said, this is Irma.  She say, hey,

21  Irma.  I say, Ms. Becky, I say, do I have a job.  She

22  say, Irma, I'm sorry to inform you but - oh, Jesus.  She

23  say, we can't use your service because you - because you

24  can't wear pants.  And that hurted me.  My baby wasn't

25  there.  He was at my sister house.

1  my skirt.

2  Q    Okay.  And then as you were walking out the door

3  she said that she would call you.  And then the next day

4  you talked to Ms. Becky Hollis, who's the HR director,

5  asking if you still had a job.  And she said we're going

6  to try to find some place to put you.  And did she tell

7  you that in order to work in the stockroom you have to

8  wear pants?

9  A    She didn't tell me right then.

10 Q    Okay.  Eventually she told you that?  You think on

11 the -

12 A    She didn't tell me that in order to work in the

13 stock department.  She told me that they couldn't use my

14 service -

15 Q    Okay.

16 A    - because I couldn't wear pants.  She didn't even

17 bring up the stock department.

18 Q    And is it your understanding that the job that you

19 were hired to do, to work in the stockroom, that you

20 can't wear pants?

21 A    Then I didn't have no understanding.

22 Q    Okay.  How about now?

23 A    As you speak and as you showed me - I don't feel

24 like - I mean -

25 Q    That that's a Sears policy, you know that now, that

99

1  A    She didn't call me.  I called her.

2  Q    I'm sorry.  You called her.  And she said, I'm

3  sorry, Irma, to inform you that we can't use your

4  services because you can't wear pants?

5  A    That's what she said.

6  Q    Again, nothing was said because of religion?

7  A    That's what she said.

8  Q    All right.  And nothing was said about your

9  religion, right?

10  A    That's what she said.

11  Q    Okay.  In other words, she didn't say anything else

12  about your religion during that conversation, other than

13  she couldn't use your services because you can't wear

14  pants?

15  A    That's all she said.

16  Q    Okay.  What religion are you?

17  A    Holiness.

18  Q    And where do you practice that?

19  A    At the Church of the Living God -

20  Q    And where is that?

21  A    - Pillow Ground of the Truth on -

22  Q    I'm sorry.  Church of the Living God -

23  A    Pillow Ground of the Truth.

24  Q    - Pillow Ground of the Truth?

25  A    Correct.

1  Q     Okay.  What else do you believe?

2  A     Eating clean food.

3  Q     Pardon me?

4  A     Eating clean food.

5  Q     Okay.  What's clean food?

6  A     Fish, a certain kind of fish though, or veal,

7  chicken.

8  Q     Okay.

9  A     Dress code.

10  Q     Is there any other dietary restrictions?

11  A     Certain - certain fish, certain meats.  We don't

12  eat pork.

13  Q     Okay.  What about alcohol?

14  A     No, ma'am.

15  Q     Okay.  All right.  What's the dress code?

16  A     Dress code for women's dresses, skirts, no pants.

17  We're not to wear our arms out.

18  Q     Okay.

19  A     Three-quarter length.

20  Q     Okay.

21  A     Head coverings when we go to church -

22  Q     All right.

23  A     - anywhere.

24  Q     And what?

25  A     When we go to church anywhere.

1   A     She said, oh, we can work around that.

2   Q     Okay.  All right.  After Ms. - after Ms. Hollis

3   called you and said that she was sorry to inform you

4   that she couldn't use your service because you couldn't

5   wear pants did you call Sears again?

6   A     Yes.  I was trying to get Mr. Don.

7   Q     Okay.  How many times did you call to get to Mr.

8   Don?

9   A     Oh, he's hard to catch up with.

10  Q     He's the store manager, correct?

11  A     Yes.

12  Q     All right.  Do you know how many times you called?

13  A     About four.

14  Q     Okay.  And -

15  A     Not all in one day.

16  Q     Okay.  And eventually you talked to Mr. Holley,

17  correct?

18  A     Correct.

19  Q     And at that time Mr. Holley offered you the other

20  position they had in housekeeping, correct?

21  A     He - I wouldn't call it - well, he didn't state

22  housekeeping.

23  Q     Okay.  What did he state?

24  A     He stated he had three days available, and that's

25  part-time, cleaning out the commodes.

1 Q    He told you that - he said that - he didn't tell

2 you what the - all he said about the job was that you'd

3 be cleaning out commodes?

4 A    Yes, that's what he said.

5 Q    Okay.  And what happened?

6 A    I didn't in turn tell him no and I didn't in turn

7 tell him yes because I knew what I had put on those -

8 that application.  I asked him a direct - after he told

9 me about the job, I direct a question to you and said,

10 well, Mr. Don, I say, well, what you got coming up.  You

11 say, I got customer service October - September,

12 October.  And I said, well, will you give me a call.

13 But you - you never did call me.

14 Q    Okay.  And you don't have to - this is not the time

15 for -

16 A    Oh, okay.

17 Q    This is the time for me to ask you questions about

18 it.  Okay?  So you remember that you didn't tell him yes

19 or no about the part-time job in housekeeping cleaning

20 the commodes, but you ultimately did not take that job,

21 correct?

22 A    I didn't refuse it.

23 Q    Okay.  Did you accept it and start working at Sears

24 doing that?

25 A    I did not refuse it.  That's all I'm going to say.

106

1  Q     Okay.  And I'm confused about this.

2  A     I'm saying that -

3  Q     Then why didn't you start?

4  A     Because of Saturday.

5  Q     Okay.  Did you tell him you weren't going to start

6  because it involved work on a Saturday?

7  A     At that time, no, I didn't.

8  Q     All right.  And you said instead what else do you

9  have coming up.  And he said, we may have something in

10 customer service in September or October, and you asked

11 him to call you?

12 A     Yes.

13 Q     Okay.  And he didn't call you?

14 A     No.

15 Q     Did you call to inquire about the jobs coming up?

16 A     At that time I was trying to get a job somewhere

17 else.

18 Q     Okay.  All right.  Where else did you try to get a

19 job?

20 A     I think - I went to the unemployment office, also I

21 went back to Manpower.

22 Q     All right.

23 A     And then I think that's where Super 1 came in for

24 the next year.

25 Q     All right.  Did you go back to the WTOC office to